**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**at Baltimore**

| | | |
|---|---|---|
| IN RE: | * | |
| **GLOBAL ENERGY SERVICES, LLC** | * | **CASE NO. 21-17305-NVA** |
| **Debtor** | * | **(Chapter 7)** |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

| | | |
|---|---|---|
| **ZVI GUTTMAN, CH. 7 TRUSTEE** | * | |
| **P.O. Box 32308** | | |
| **Baltimore, MD 21282** | * | |
| **Plaintiff** | * | |
| **v.** | * | **Adversary No.** |
| **SPARTAN BUSINESS SOLUTIONS,** | * | |
| **LLC d/b/a SPARTAN CAPITAL** | | |
| **371 East Main Street, Suite 2** | * | |
| **Middletown, NY 10940** | | |
| | * | |
| **Defendant** | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

## OBJECTION TO CLAIM AND COMPLAINT FOR DECLARATORY RELIEF; FOR RECOVERY OF FRAUDULENT TRANSFERS PURSUANT TO 11 U.S.C §§ 544 AND 548; FOR RECOVERY OF PREFERENTIAL TRANSFERS PURSUANT TO 11 U.S.C. § 547; AND FOR TURNOVER OF PROPERTY PURSUANT TO 11 U.S.C. § 542

Zvi Guttman, the chapter 7 Trustee of the Bankruptcy Estate of Global Energy Services,

Inc., by its undersigned counsel, hereby files this Complaint (i) objecting to Claim no. 5-1 filed by

Spartan Business Solutions d/b/a Spartan Capital and seeking an order of this court determining

the validity, priority and extent of Spartan's lien, (ii) for recovery of fraudulent transfers; (iii) for

recovery of preferential transfers; and (iv) for turnover of property**.**

1

**NOTICE IS HEREBY GIVEN TO CLAIMANT PURSUANT TO MARYLAND LOCAL BANKRUPTCY RULE 3007-1:**

**(a) Within thirty (30) days after the date on the certificate of service of the objection, the claimant may file and serve a memorandum in opposition, together with any documents and other evidence the claimant wishes to attach in support of its claim, unless the claimant wishes to rely solely upon the proof of claim; and**

**(b) an interested party may request a hearing that will be held at the court's discretion.**

## JURISDICTION AND VENUE

1.      The Bankruptcy Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 334 and 11 U.S.C. §§ 105, 502, 506, 542, 544, 547, 548 and 550. This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (E), (F), (H), (K) and (O).

2.      Venue is proper in this district in that this objection and adversary proceeding arise under Title 11 of the United States Code (the "Bankruptcy Code") as provided in 28 U.S.C. § 1409.

## THE PARTIES

3.      Plaintiff is Zvi Guttman, the chapter 7 trustee of the Bankruptcy Estate of Global Energy Services, LLC (hereafter "Plaintiff" or "Trustee").

4.      Defendant is Spartan Business Solutions LLC dba Spartan Capital (hereafter "Defendant" or "Spartan").

## STATEMENT OF FACTS

5.      Global Energy Services LLC, the Debtor, filed its petition for relief under Chapter 11 ("Petition") in this Court on November 19, 2021 (the "Petition Date").

6.      On January 28, 2022, upon the motion of the Debtor, this case was converted to one under Chapter 7.

7.     Upon conversion, Zvi Guttman was appointed the Chapter 7 trustee and has continued in that capacity since that time.

8.     As of October 31, 2020, the Debtor's books and records showed its assets at fair market value of $5,120,759.93 and showed total liabilities of $7,723,439.16. The liabilities on the Debtor's books and records did not include the subrogation claims of the Sureties, more fully described below.

9.     The claims register in this case shows that, as of the Petition Date, the secured claims of PNC, the Sureties and the SBA (as more fully described below) totaled $3,931,269.10. The claims register also shows that pre-petition priority claims totaled $140,374.48 and general unsecured claims totaled $3,931,269.10, for total claims filed of $8,002,912.68. The Debtor's Schedules of Assets & Liabilities shows that the Debtor's assets were valued at $2,653,022.85[1].

10.     At all times relevant to this Complaint, the Debtor was insolvent as that term is defined in 11 U.S.C. § 101(32) and applied in 11 U.S.C. §§ 547 and 548, as well as defined in Md. Comm. Law. Code Ann. § 15-202 and applied in 11 U.S.C. § 544. No intervening events occurred between October 31, 2020 and the Petition Date that would cause the Debtor to become solvent as defined above at any time during that period.

11.     At all times relevant to this Complaint, the assets of the Debtor, including but not limited to its accounts receivable and proceeds thereof, were property of the Debtor and subject to the valid security interests of PNC Bank, N.A., the Sureties, and the Small Business Administration.

---

[1]     The debtor's Schedules of Assets & Liabilities did not reflect a Letter of Credit held for the benefit of the Sureties in the amount of $500,000.

<u>The Secured Claim of PNC</u>

12.     On or about May 17, 2017, PNC Bank, National Association ("PNC") extended a $2,000,000 revolving loan (the "Loan") to the Debtor.

13.     The Loan was evidenced by, among other things, that certain (i) Committed Line of Credit Note, dated May 8, 2017, in the original principal amount of $2,000,000.00, executed and delivered by the Debtor to the order of PNC; and (ii) Loan Agreement, dated March 8, 2017, by and between the Debtor and PNC.

14.     The Loan was secured by a security interest in and liens in, to and against all assets of the Debtor pursuant to a Security Agreement dated May 8, 2017, by and between the Debtor and PNC and perfected by the filing of a financing statement with the Maryland State Department of Assessments and Taxation ("SDAT") on June 6, 2017 and a continuation statement on January 12, 2022.

15.     In addition to the amount owed by the Debtor under the PNC loan documents, the Debtor was also liable to PNC as a result of the execution by the Debtor of a Guaranty and Suretyship Agreement dated May 10, 2017, pursuant to which the Debtor absolutely and unconditionally guaranteed the obligations owed by 20 W. Aylesbury Road, LLC to PNC.

16.     PNC filed its Proof of Claim in the amount of $3,381,812.57 (Claim no. 31)

<u>The Secured Claims of the Sureties</u>

17.     On December 21, 2015, as a condition precedent to extending surety credit to the Debtor, United States Surety Company and U.S. Specialty Insurance Company (the "Sureties") and the Debtor entered into a General Indemnity Agreement whereby Debtor agreed to, *inter alia*, indemnify and hold Sureties harmless for all losses, costs, demands, judgments resulting from

issuing bonds for the Debtor that were required for the Debtor to perform its business (the "Indemnity Agreement").

18.     The Indemnity Agreement further provided for a security interest in, *inter alia*, the Debtor's right, title and interest to or arising in any manner out of any contract including, without limitation, the right to receive progress payments, payments on claims, charges or allowances, retained sums or any and all other monies due or to become due deriving any manner from any contract.

19.     The Sureties' security interest was perfected by filing a financing statement with SDAT on October 29, 2018. As part of the UCC-1 filing, the Sureties attached a copy of the Indemnity Agreement.

20.     Additionally, under the Indemnity Agreement and applicable law, all funds from any bonded contract or derived from bonded contracts were trust funds being held for the benefit of the Sureties and the subcontractors and suppliers providing labor and materials for the performance of the bonded contracts.

21.     The Sureties filed proofs of claim in the amounts of $1,181,832.00 (Claim no. 32) and $206,989.15 (Claim no. 33).

<u>The Secured Claim of the SBA</u>

22.     On June 24, 2020, the Debtor executed a Promissory Note in favor of the Small Business Administration ("SBA") in the principal amount of $150,000.00.  Pursuant to a First Modification of Note, the loan amount was increased to $500,000.00.

23.     On July 30, 2021, the Debtor executed an Amended Security Agreement for the benefit of the SBA for the purpose of securing the SBA loan. The SBA Amended Security

Agreement granted the SBA a lien on all assets of the Debtor, which lien was perfected by the filing of a financing statement with SDAT on July 4, 2020.

24.     The SBA filed its Proof of Claim in the amount of $509,914.38 (Claim no. 16).

<u>Other Entities Filing Financing Statements With SDAT</u>

25.     In addition to PNC, the Sureties and SBA, other entities, including other merchant cash advance entities, also filed financing statements with SDAT against the Debtor and certain assets of the Debtor.

26.     When Defendant filed its UCC-1 Statement with SDAT, it was either aware of, or could have readily ascertained, the existence of multiple liens, including the subrogation rights of the Sureties under the Indemnity Agreement, that were outstanding at the time and superior to the Defendant. The Indemnity Agreement was part of the public record that Defendant could have availed itself to ascertain the Sureties' superior rights.

<u>The Proof Of Claim Filed By Defendant</u>

27.     On December 1, 2021, Defendant filed Claim no. 5-1 in the amount of $121,088.50 (the "Claim"). A copy of its Proof of Claim is attached as Exhibit 1 and incorporated by reference as if more fully set forth herein.

28.     The Claim arises from a prepetition agreement dated October 15, 2021 (the "Agreement"), by and between the Debtor (known in the Agreement as "Merchant") and the Defendant (known in the Agreement as "SPARTAN"). A copy of the Agreement is attached as Exhibit 2 and incorporated by reference as if more fully set forth herein. All obligations of the Debtor under the Agreement were incurred as of that date (the "Obligations").

29.     The Claim states that the amount of the claim does not include interest.

30.     The Claim is filed as a fully secured claim.

31.     Defendant filed a financing statement with SDAT on October 22, 2021.

32.     Section 39 of the Agreement provides that New York law is the applicable law.

33.     Debtor at all times treated the Agreement with Defendant as a loan on its books and records.

### COUNT I - OBJECTION TO PROOF OF CLAIM
### AND COMPLAINT FOR DECLARATORY RELIEF

## NOTICE IS HEREBY GIVEN TO CLAIMANT PURSUANT TO MARYLAND LOCAL BANKRUPTCY RULE 3007-1:

**(a) Within thirty (30) days after the date on the certificate of service of the objection, the claimant may file and serve a memorandum in opposition, together with any documents and other evidence the claimant wishes to attach in support of its claim, unless the claimant wishes to rely solely upon the proof of claim; and**

**(b) an interested party may request a hearing that will be held at the court's discretion.**

### I.  The Proof Of Claim Filed By Defendant Is Insufficient

34.     Plaintiff incorporates paragraphs 1 through 33 as if more fully set forth herein.

35.     The Proof of Claim filed by Defendant states it is owed $121,088.50; however, the Claim fails to provide any accounting to show the application of payments received from the Debtor totaling $17,550.00, or any costs and charges assessed against the Debtor. Plaintiff cannot determine how the amount stated was determined and whether Defendant correctly applied payments received from the Debtor or whether charges or costs were properly assessed.

### II. The Proof Of Claim Of Defendant Is Unenforceable

36.     Defendant's claim is unenforceable as the underlying transaction, while purporting to be a sale of Debtor's Receivables (as that term is defined in the Agreement) is in fact a disguised loan that required Debtor to pay usurious interest and thus is *void ab initio* under New York law.

37.     This Court must first determine whether, despite the language of the Agreement, whether the transaction between the parties was, in fact, a loan disguised as a sale. If the answer is in the affirmative, then this Court must decide whether the loan is usurious, in violation of New York's criminal usury statute and therefore void. If the Court finds the loan to be in violation of this statute, Defendant's Claim must be denied.

Under The Agreement, The Risk Of Loss Was Borne<br>By The Debtor And Therefore, The Agreement Was A Loan

38.     To determine whether the transaction was a sale or a loan, this Court must first determine which party bore the risk of loss. In *Fleetwood Services, LLC v. Ram Capital Funding, LLC*, 2022 WL 1997207 at *10 (S.D.N.Y. June 6, 2022), *aff'd*, 2023 WL 3882697 (2d Cir. 2023), the Court stated that:

> The ultimate question … relates to whether the transaction involves a transfer of risk. Where the putative "lender and not the [putative] borrower bears the risk of non-performance by the account debtor" and "the borrower's debt is extinguished" by the transaction, the "the lender's risk with regard to the performance of the accounts is direct," and the transaction is properly characterized as the purchase of accounts receivable. *Endico Potatoes, 67 F.3d at 1069.* By contrast, the transaction is property characterized as a loan where "the lender holds only a security interest [and] the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will the leave the borrower unable to satisfy the loan." *Id.; See also Adar Bays, LLC 179 N.E.3d at 622* ("Parties who are not directly exposed to the market risk in the value of the underlying assets are likely to be lenders, not investors.)

39.     Under the Agreement, it was the Debtor who bore the risk of loss. Section 1 of the Agreement provided that the Debtor sold:

> "… all of [Debtor's] future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third-party payors [hereafter referred to as "Receivables"]…".

In essence, the Agreement purported to be the sale of the Debtor's future receivables and the proceeds thereof that were generated by the Debtor after the execution of the Agreement (hereafter

referred to as the "Post-Agreement Receivables"). While the Debtor billed its customers monthly, it was the Debtor's experience that collection of its receivables took at least 120 days from the transmission of the billing. This delay in collection is common within the Debtor's business and within the construction industry generally. Under the terms of the Agreement, it was only after the Debtor collected the Post-Agreement Receivables allegedly sold to Defendant would it have been entitled to receive payment, but that is not what actually occurred.

40.     Section 6 of the Agreement provided that:

> Merchant(s) shall appoint a bank acceptable to SPARTAN, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide SPARTAN and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize SPARTAN and/or its agent(s) to deduct the amounts owed to SPARTAN for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to SPARTAN by permitting SPARTAN to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent SPARTAN's written consent.

41.     While the Post-Agreement Receivables would have been collected by the Debtor no sooner than 120 days after the billing of those Post-Agreement Receivables, Defendant commenced debiting daily ACH payments of $1,350.00 from Debtor's bank account within four (4) days of the execution of the Agreement. During the period from October 19, 2021 through November 3, 2021, Defendant debited payments totaling $17,550.00 (the "Transfers"). None of the Transfers received by Defendant arose from Post-Agreement Receivables. Based upon the daily payments of $1,350.00 that were required under the Agreement, Defendant would have been paid in full prior to the Debtor's receipt of any of the Post-Agreement Receivables.

42.     In *Fleetwood Services,* the Court observed that the analysis for determining whether a transaction is classified as a loan or a sale usually is guided by examining three factors to "determin[e] whether repayment is absolute or contingent: (1) whether there is a reconciliation

provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *See also, LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 122 N.Y.S.3d 309, 312, 181 A.D.3d 664 (S.Ct. N.Y. 2020). In this case, all three factors are present and favor a finding that the transaction was a loan. However, these factors are merely guides.  The *AKF* Court observed:

> "When determining whether a transaction is  a loan, substance – not form – controls. *Adar Bays, 157 N.Y.S.3d 800, 37 N.Y.3d 320, 179 N.E.3d at 622* (citations omitted); *LG Funding, 122 Y.S.3d at 312* ('[The transaction] must be considered in its totality and judged by its real character, rather than by its name, color, or form which the parties see fit to give it" …

*AKF, Inc. v. Western Foot & Ankle Center,* 2022 WL 4538869 at *7  (E.D.N.Y. September 28, 2022)

### 1.  The Reconciliation Provision Was Illusory

43.     The first factor requires that the Agreement contain a reconciliation provision. As pointed out in *Fleetwood Services, LLC, supra*, a reconciliation provision that does not adjust the daily payment due, but simply credits any overpayment, is illusory. The *Fleetwood* Court found the reconciliation to be illusory:

> The Fleetwood Agreement nominally has a reconciliation provision, Dkt. No. 77-1 at 1 ("RCF *will* debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month *reconcile the Merchant's Account* by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage" (emphasis added)). But that provision functions in such a way that renders it largely illusory. It does not relieve Fleetwood of the obligation, if the merchants do not pay the specific daily amount, for Fleetwood to pay the specific daily amount, nor does it qualify the right of Richmond, if the specific daily amount is not paid for four days, to declare the full Purchased Amount immediately due and payable and to exercise its rights to collect as against Fleetwood. *Id.*

44.     Section 4 of the Agreement is similar to the Fleetwood Agreement in that it provides that "[i]f such reconciliation determines that SPARTAN collected more than it was

entitled to, then SPARTAN will credit to the Account all amounts to which SPARTAN was not

entitled....". The Agreement does not relieve the Debtor of any daily payments in the event it had

overpaid Defendant. This supports the contention that the reconciliation provision in Section 4 of

the Agreement is illusory.

45.     Section 14 of the Agreement provides that "[i]n no event will SPARTAN be liable

for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost

business opportunities, exemplary, punitive, special, incidental, indirect, or consequential

damages, each of which is waived by each Merchant and each Guarantor." Under Section 14, the

Debtor's waiver meant that the reconciliation provision was illusory, as the Debtor waived its

rights against Defendant in the event that the reconciliation would have determined overpayment.

46.     Further, given that the Debtor was in default under the terms of the Agreement from

its execution (see below), the obligation was subject to acceleration and Defendant could have

insisted on full payment from the first day.

2. The Agreement Had A Finite Term

47.     The second factor requires a finite term. While the Agreement does not, on its face,

provide a finite term, it is apparent that the obligation comes due at a specific date. Given that there

is no true right to a reconciliation, the term for repayment is set by the daily cap amount in Section

3 of the Agreement of $1,350 per day, multiplied by the number of days required for Defendant to

be paid the sum of $108,000. *See AKF, Inc. v. Western Foot & Ankle Center,* 632 F.Supp.3d 66,

78 (E.D.N.Y. 2022).

48.     Again, given that the Debtor was in default under the terms of the Agreement from

its execution (see below), the obligation was subject to acceleration and Defendant could have

insisted on full payment from the first day.

### 3.  Defendant Has Recourse In A Bankruptcy Filing

49.     The third factor looks to whether the lender had recourse upon a bankruptcy filing by the merchant. Paragraph 6 of Section 34 of the Agreement provides an event of default if  "Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of SPARTAN." Upon a filing in bankruptcy, all assets are transferred to the bankruptcy estate by 11 U.S.C. § 541. Therefore, the transfer of assets to the bankruptcy estate triggers a default under the Agreement.

50.     Defendant would have a claim against the debtor's estate. See U.S.C. § 101(5) and (10). This case was initially filed as a chapter 11 proceeding. Under 11 U.S.C. § 1111(b), as a secured creditor, Defendant would have a recourse right. Thus, bankruptcy extends the legal rights of Defendant even if a default had not existed as a result of the filing.

51.     Even if the filing did not trigger a default, the Debtor was in default at the time of the execution and the entire Obligation was due and owing at the time of the filing. The facts of this case support the conclusion that Defendant had recourse against the bankruptcy estate. In fact, Defendant has filed its Proof of Claim based on a default of the Debtor under the terms of the Agreement.

52.     When this Court evaluates the Agreement with Defendant as a whole, both on the language of the Agreement and on the applicable facts and law, the conclusion to be reached is that the Agreement is a loan.

### The Defaults Under The Agreement
### Are Evidence That The Transaction Was A Loan

53.     A number of courts have recently held merchant cash agreements to be a loan rather than a sale when defaults under the agreement permitted the alleged purchaser to immediately accelerate the obligation and proceed with classic collection actions. *See*, *for example, The New*

*Y-Cap et al. v. Arch Capital Funding*, 2019 WL 4805897 (S.D.N.Y 2019); *see also, Fleetwood Services, supra.*

54.    Under the Agreement with Defendant, defaults existed at the time of the execution and funding of the Agreement and, as a result, the obligation was subject to acceleration and Defendant was permitted to immediately commence collection actions.

<u>Debtor's Representations Regarding Good Title To Assets</u>

55.    Section 33 of the Agreement required Debtor to make certain covenants, representations and warranties. Section 33 required that Debtor "…agrees to execute any documents or take any action in connection with this Agreement as SPARTAN deems necessary to perfect or maintain SPARTAN's <u>first priority security interest in the Collateral</u> and the Cross-Collateral, including the execution of any account control agreements." (Emphasis added)

56.    Defendant  knew or should have known that it did not possess a first priority lien on the Collateral at the time of the execution of the Agreement.[2] Any such covenant on the part of Debtor to protect Defendant's fantasy priority was beyond Debtor's capabilities vis-a-vis PNC's, Sureties' and SBA's prior perfected rights and the Sureties' subrogation rights. This requirement created a potential default upon execution of the Agreement.

<u>Breaches of PNC's and Sureties' Agreements</u>

57.    Section 32 of the Agreement required Debtor to represent that the execution of the Agreement would not constitute a breach of any other agreement. Section 32 specifically provided

---

[2]    Section 29 required Debtor to "represent, warrant and covenant that it had good, complete and marketable title to all Receivables, free and clear of any liabilities, liens, claims, … other than any for which SPARTAN has actual or constructive knowledge as of the date of the Agreement." Given the UCC-1 filings, Defendant knew it did not have a first lien; thus, the covenant contained in Section 33 set the Debtor up for a default as it would never be able to satisfy that covenant.

that Debtor's "execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity."

58.    The obligation owed by the Debtor to PNC was secured by a blanket lien on all of the assets of the Debtor. Paragraph 6 of the PNC security agreement contained the following negative covenant:

> 6. Negative Pledge; No Transfer. Without the Bank's prior written consent, the Granter will not sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien, security interest or right of setoff upon the Collateral (except for sales of inventory and collections of accounts in the Grantor's ordinary course of business), will not allow any third party to gain control of all or any part of the Collateral, and will not use any portion of the Collateral in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.

59.    Paragraph 8 of the PNC security agreement contained a default provision that provided, in pertinent part:

> 8. Events of Default. The Grantor shall at the Bank's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "Event of Default"): **...** (b) any default under any of the Obligations that does not have a defined set of "Events of Default" and the lapse of any notice or cure period provided in such Obligations with respect to such default; ... (d) the failure by the Grantor to perform any of its obligations under this Agreement; ...

60.    Further, on December 21, 2015, as a condition precedent to extending surety credit to Debtor, the Sureties and Debtor entered into an Indemnity Agreement (as more fully described above).

61.    As part of its UCC-1 filing, the Sureties attached a copy of the Indemnity Agreement. The Indemnity Agreement defined the following events of default:

> 8. Any diversion of any Contract funds by any Principal from any Bonded Contract to make payment of obligations on any other Bonded Contract, any bonded Contract, or unbonded Contract, or any other obligations of any kind, prior to obtaining the complete discharge of the Surety on the Bonded Contract from which funds have been diverted;

…
20. Any pledge or assignment by the Principal of any contract balance or contract receivable from a Bonded Contract to a third party, including a lender or factor. without the prior express written authority of the Surety; …

62.    The language of the Sureties' Indemnity Agreement and PNC's security agreement clearly indicated that the Debtor's transfer of its Receivables (inclusive of its rights to all contracts) to Defendant would be an event of default under their contracts, thereby causing a default under Section 32 of the Agreement with Defendant.

63.    Further, Section 50 of the Agreement provided that "[a]ll representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all Obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated."  This Section provided that all of the Debtor's misrepresentations at the execution of the Agreement continued, and all such defaults that occurred as a result thereof likewise continued.

64.    Section 51 of the Agreement provided that: **"No failure on the part of SPARTAN to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity."  There was no waiver of the defaults by Spartan.

65.    The consequence of such defaults is controlled by both Sections 17 and 34 of the Agreement. Any default permits Defendant to accelerate its debt. In pertinent part, Section 17 provides that upon default:

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

15

Protection 2. SPARTAN may enforce the provisions of the Guarantee against Guarantor.

Protection 3. SPARTAN may enforce its security interest in the Collateral identified in Section 33.

Protection 4. SPARTAN may proceed to protect and enforce its rights and remedies by litigation or arbitration.

66.     Section 35 of the Agreement provided that:

In case any Event of Default occurs and is not waived, SPARTAN may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of SPARTAN in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by SPARTAN after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, SPARTAN will be entitled to the issuance of an injunction, restraining order, or other equitable relief in SPARTAN's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SPARTAN as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SPARTAN being required to furnish a bond or other undertaking in connection with the application.

67.     Taken as a whole, as a consequence of these enumerated defaults, Defendant had immediate right to collect its full amount of the Obligation at the time it funded the Agreement.

<u>The Loan Is Criminally Usurious</u>

68.     Once this Court finds that the Agreement was a loan and not a sale, the Court must then determine whether the Agreement violates New York's Criminal Usury Law.

69.     New York's criminal usury statute provides that: "[a] person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of

any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." N.Y. Penal Law § 190.40 (McKinney).

70.     To find criminal usury under New York law, the Court in *AKF, Inc, supra,* stated that:

> "a debtor must allege and prove by clear and convincing evidence that [(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] was charged by the lender or payee with the intent to take interest in excess of the legal rate [of 25% per annum].' *Blue Wolf Cap Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 961 N.Y.S.2d 86, 89 (2013) (citations omitted); N.Y. Penal Law § 190.40 (McKinney 2022) (making it unlawful to charge interest on a loan "at a rate exceeding twenty-five per centum per annum[.]"). "Under [New York law], the defense of [civil] usury [(i.e., interest over 16%)] is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action[.]" *See Adar Bays, LLC v. GeneSYS Id, Inc.,* 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612,616 (2021). On summary judgment, a debtor may meet its "burden of proof simply by submitting the [contract] evidencing the usurious transaction." *Funding Grp., Inc. v. Water Chef, Inc.*, 19 Misc.3d 483, 852 N.Y.S.2d 736, 740 (Sup. Ct. 2008)."

71.     The first element requires that the agreement be a loan or forbearance of money. That element has been met. The Agreement was intended to be and, based upon the tests adopted by New York courts, was in fact a loan. The New York Criminal Usury Statute is applicable to commercial loans for less than $2.5 million.  As can be seen from the Agreement, this loan was for a total of $108,000.00 and falls within the Statute.

72.     The second element requires that the interest charged is in excess of 25%. In calculating the effective interest rate, New York courts look to the procedure set forth in *Band Realty Company v. North Brewster, Inc.*, 37 N.Y.2d 460 (1975):

> Pursuant to the *Band* formula, the "true" annual interest rate is determined by taking the "discount"—i.e., the difference between the amount advanced to the borrower and the amount owed to the lender—dividing that amount by the number of years in the term of the loan, adding that amount to the interest rate stated on the note, and dividing this sum by the difference between the principal and the discount (i.e., the net advance). *Canal*, 41 N.Y.S.3d at 829 ("In applying the [Band formula], the

discount, divided by the number of years in the term of the [loan], should be added to the amount of interest due in one year, and this sum is compared to the difference between the principal and the discount in order to determine the true interest rate[.]" … ("Where, as here, the loan is for less than a year, the interest rate is annualized[.]); …

*AFK, Inc.,* 632 F.Supp.3d at 79.

73.     Applying the *Band* formula to the provisions of the Agreement, the effective interest rate is 200%. This interest rate exceeds the 25% interest rate allowed by New York and is patently usurious.

74.     The third and final element is to prove that the interest charged by the lender or payee is with the intent to take interest in excess of the legal rate of 25% per annum. The *AKF* Court provided a primer on New York law as it comes to what evidence will be sufficient to meet burden of the third element:

*10 The New York Court of Appeals has articulated two tests for identifying transactions so patently usurious such that usurious intent is imputed as a matter of law. The first is the 'usurious effect' test, focusing on the transaction's usurious consequences. *See Fiedler*, 50 N.Y. at 443 ("The effect of the transaction was to secure the plaintiff more than [the statutory maximum] for the loan. The agreement was vicious because of the usurious effect, by which the intent of the parties must be judged" (emphasis added)); *Seymour v. Strong*, 4 Hill 255 (N.Y. Sup. Ct. 1843) ("The [transaction has a] usurious effect, by which the intent of the parties must be judged[.]") (New York's highest court before 1846); *Hall v. Earnest*, 36 Barb. 585 (N.Y. Sup. Ct. 1861) ("The argument that there can be no usury ... when the party [executing] the paper is ignorant [of its character], and is in fact [told by others that the paper is legal], is not sound if the legal effect of the transaction involves a usurious agreement[.]"). The second, stemming from the *Freitas* decision, is the 'usurious on its face' test which asks whether the usury, usually the interest rate itself, "appear[s] on the face of the note[.]" *See* 63 N.Y.2d 254, 481 N.Y.S.2d 665, 471 N.E.2d at 443 (finding that usurious intent could not be imputed to a mortgagee charging more than the lawful sum of interest, because the contract stated only a lawful amount of interest and the mortgagee inadvertently labelled and charged inspection services as fees and thereby elevated the interest amount); *Greenfield v. Skydell*, 186 A.D.2d 391, 588 N.Y.S.2d 185, 185 (1992) ("[I]n this case, no stated rate of interest appears upon the face of the note[;] ... [thus t]o establish usury, facts extrinsic to the document must be referred to."); *AJW Partners, LLC v. Cyberlux Corp*, 21 Misc.3d 1109A, 873 N.Y.S.2d 231 (Sup. Ct. 2008) (same). "[B]ecause a usurer usually seeks to conceal the usury, and to accomplish the purpose by indirect

methods, questions of usurious intent … are typically questions of fact[.] *Adar Bays*, 157 N.Y.S.3d 800, 37 N.Y.3d 320, 179 N.E.3d at 625.

*AKF, Inc.*, 632 F.Supp.3d at 81.

75.    The *AKF* Court found, much like the case before this Court:

"… it is the RPA's language itself that spells usury. From the four corners of the contract, the Court gleans a loan at an interest rate five times the statutory limit, ostensibly backed by collateral. … the transfer of $93,614 in return for $130,545 paid under demanding conditions, including an implicit term of slightly over six months—"was merely a way of expressing" a loan at a grossly usurious rate. Thus, the Court imputes usurious intent as a matter of law.

*Id* at 82.

76.    Intent can be shown by one of two ways. The first test is the "usurious effect" test, which focuses on the transaction's usurious consequence; *See Fiedler*, 50 N.Y. at 443 ("The effect of the transaction was to secure the plaintiff more than [the statutory maximum] for the loan. The agreement was vicious because of the usurious effect, by which the intent of the parties must be judged"). Here, Defendant disguised the transaction as a sale, attempting to bypass the New York Criminal Usury Statute while the true intent was to make a loan at a usurious rate.

77.    The second test is the "usurious on its face" test. This test is satisfied if the usurious rate can be calculated from the four corners of the Agreement. In this case, this Court can conclude that effective interest rate under the Agreement exceeded the statutory rate, as the terms of the Agreement provided for the transfer from Defendant to Debtor of $75,000.00 in return for $108,000.00 paid by Debtor to Defendant, including an implicit term of slightly over 80 days,[3] resulting in an effective interest rate of 200% or an annualized interest rate of 9127%. Like the finding by the *AKF* Court, the Agreement was "merely a way of expressing" a loan at a grossly usurious rate. Like the *AFK* Court, this Court should impute usurious intent as a matter of law.

---

[3]    The reconciliation provision, as demonstrated was illusory so it does not factor into the calculation. So, one would use the daily rate of $1,350 times the number of days needed to repay $108,000.

### The Agreement is Void Ab Initio

78.     Once this court finds that a contract violated the criminal usury statute, the contract is *void ab initio*. In 2021, the Court of Appeals of New York held "… loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612, 157 N.Y.S.3d 800, 809 (N.Y.App. 2021).

79.      In *Adar Bays*, the Court stated that "where usury is established, the transaction is entirely void, preventing recovery of both principal and interest." *Adar Bays*, 157 N.Y.S.3d at 808.

### Declaratory Relief is Appropriate

80.     An actual controversy exits between the parties as to the validity, priority and extent of the validity, amount and security of the Agreement.

81.     The receivables, as defined in the Agreement, that were transferred to the Defendant were known by the Defendant to be in derogation of PNC's and the Sureties' first and second lien rights and the Sureties' subrogation rights.

82.     The Defendant holds the Transfers, or the value of such Transfers, in trust for the Estate.

83.     A judicial declaration is necessary and appropriate under the circumstances in order to determine the rights and duties of the parties relating to the Agreement as follows:

        a.      That the Agreement is a Loan;

        b.      That the interest rate in the Agreement was usurious under New York law;

        c.      That Defendant knowingly and purposefully charged a usurious interest rate and intended to take interest in excess of the legal rate of 25% per annum;

      d.     That Defendant does not own any percentage of Debtor's accounts receivable or any other asset of Debtor;

      e.     That the Agreement is *void ab initio* due to its usurious nature;

      f.     That the liens of Defendant are *void ab initio*; and

      g.     That the Transfers made to Defendant are held in trust for the Estate.

<u>Conclusion</u>

84.     The evidence shows that the Agreement was a sham sales agreement, both by the language of the Agreement itself as well as the underlying facts. At best, the Agreement is a loan that provides for an interest rate that is usurious under New York law and is thus *void ab initio*. The facts prove that the Agreement called for certain representations and warranties that formed the basis of the Agreement and these representations and warranties survived closing. These representations, including that the sale of Debtor's Post-Agreement Receivables was free of all liens, encumbrances and claims and that the execution of the Agreement would not cause a breach of another agreement between Debtor and a third party, were false and Defendant either knew they were false at the time the representations were made or was intentionally ignorant as to the veracity of these representations. Defendant filed its own UCC-1 statement with SDAT and could have easily ascertained the existence of multiple liens that were outstanding at the time. The Sureties' bond was made part of the public record that Defendant could have availed itself to ascertain that the transfers called for under the Agreement was a default under the Bond. Those defaults gave Defendant the right to accelerate the Obligation, to curtail the reconciliation provision that was a sham to begin with, and to permit Defendant's participation in the bankruptcy proceeding filed by the Debtor (as evidenced by its Proof of Claim 5-1 filed in this case). These facts establish that the risk of loss under the Agreement was always with the Debtor and not with Defendant and that the

Agreement violated New York's criminal usury law. Therefore, the Court should conclude that the claim of the Defendant was *void ab initio* under New York law and Defendant's claim should be disallowed in its entirety.

85.     Alternatively, if this Court were to find that this Agreement was a loan transaction and is enforceable, the lien granted to Defendant is fully unsecured, as there are no assets of the Debtor to secure  its claim, as all of the Debtor's collateral is subject to the prior perfected liens of PNC, the Sureties and the SBA, and Defendant's lien would be void.  See 11 U.S.C. § 506(a) and (d).

WHEREFORE, Plaintiff prays for the entry of an Order of this Court:

a.     Finding that the Agreement between Defendant and the Debtor was a loan;

b.     Finding that the Agreement violated New York's Criminal Usury Statute;

c.     Finding that the Agreement is *void ab initio* and that Defendant is not entitled to payment of principal or interest;

d.     Finding that the lien of Defendant is void;

e.     Finding that the Transfers were held by Defendant in trust for the Estate;

f.     Sustaining the objection to Defendant's Proof of Claim; and

g.     For such other further and relief as is just and proper.

### COUNT II – AVOIDANCE OF
### FRAUDULENT TRANSFERS (11 U.S.C. § 548(a)(1)(B))
(If The Court Were To Find The Agreement To Be A Loan)

86.     The Debtor incorporates paragraphs 1 through 85 as if more fully set forth herein.

87.     The Agreement was a criminally usurious loan under New York law.

88.     Defendant received daily payments of $1,350.00 during the period from October 19, 2021 to November 3, 2021, for a total of $17,550.00 (the "Transfers").  See Schedule of

Payments, attached hereto as Exhibit 3 and incorporated by reference as if more fully set forth herein.

89.     The Debtor received less than a reasonably equivalent value in exchange for the 5/6/21 Obligations incurred.

90.     The Debtor received less than a reasonably equivalent value in exchange for the Transfers made.

91.     The Debtor was insolvent at the time that the Obligations were incurred and the Transfers were made.

WHEREFORE, Plaintiff prays for the entry of an Order of this Court:

a.     Avoiding the Obligations incurred by the Debtor under 11 U.S.C.§ 548;

b.     Avoiding the Transfers made to Defendant under 11 U.S.C. § 548;

c.     Directing Defendant to pay Plaintiff an amount equal to (i) the Transfers, (ii) interest from the date of the  filing of this Complaint, and (iii) the costs of this action; and

d.     For such other and further relief as is just and proper.

### COUNT III – AVOIDANCE OF
### FRAUDULENT TRANSFERS (11 U.S.C. § 548(a)(1)(B))
(If The Court Were To Find The Agreement To Be A Sale)

92.     The Debtor incorporates paragraphs 1 through 85 as if more fully set forth herein.

93.     The Agreement provided that Defendant was to be repaid from the proceeds of Post-Agreement Receivables.

94.     The Agreement called for payments to be made by ACH debit from the Debtor's bank account to Defendant in the daily amount of $1,350.00.

95.     Defendant received Transfers totaling $17,550.00.

96.     At the time the Transfers were made, all funds in the Debtor's bank account arose from the collection of receivables that were generated prior to the execution of the Agreement.

97.     Under the Agreement, Defendant had no rights to repayment from any of the Debtor's receivables other than Post-Agreement Receivables.

98.     The Debtor received less than a reasonably equivalent value in exchange for such Transfers.

99.     The Debtor was insolvent at the time that such Transfers were made.

WHEREFORE, Plaintiff prays for the entry of an Order of this Court:

a.      Avoiding the Transfers made to Defendant under 11 U.S.C. § 548;

b.      Directing Defendant to pay Plaintiff an amount equal to (i) the Transfers, (ii) interest from the date of the  filing of this Complaint, and (iii) the costs of this action; and

c.      For such other and further relief as is just and proper.

## COUNT IV – AVOIDANCE OF FRAUDULENT TRANSFERS
## (11 U.S.C. § 544(b) and Md. Comm. Law Code Ann. § 15-202 & 204)
### (If The Court Were To Find The Agreement To Be A Loan)

100.    The Debtor incorporates paragraphs 1 through 85 as if more fully set forth herein.

101.    The Agreement was a criminally usurious loan under New York law.

102.    Defendant received Transfers totaling $17,550.00.

103.    Debtor had creditors at the time the Obligations were incurred and the Transfers were made, and incurred additional debt thereafter. For example, Kramon and Graham, P.A. filed its claim in the amount of $20,513.88 for the services rendered to the Debtor from August, 2020 through November, 2021.

104.    The Obligations were incurred and the Transfers made without fair consideration.

105.    At the time the Obligations were incurred and the Transfers were made, the present fair market value of the Debtor's assets was less than the amount required to pay its probable liability on its existing debts as they became absolute and matured.

106.    The Debtor was insolvent at the time that the Obligations were incurred and the Transfers were made.

WHEREFORE, Plaintiff prays for the entry of an Order of this Court:

a.    Avoiding the Obligations incurred by the Debtor under 11 U.S.C. § 544;

b.    Avoiding the Transfers made to Defendant under 11 U.S.C. § 544;

c.    Directing Defendant to pay Plaintiff an amount equal to (i) the Transfers, (ii) interest from the date of the filing of this Complaint, and (iii) the costs of this action; and

d.    For such other and further relief as is just and proper.

## COUNT V – AVOIDANCE OF FRAUDULENT TRANSFERS
### (11 U.S.C. § 544(b) and Md. Comm. Law Code Ann. § 15-202 & 204)
(If The Court Were To Find The Agreement To Be A Sale)

107.    The Debtor incorporates paragraphs 1 through 85 as if more fully set forth herein.

108.    The Agreement provided that Defendant was to be repaid from the proceeds of Post-Agreement Receivables.

109.    The Agreement called for payments to be made by ACH debit from the Debtor's bank account to Defendant in the daily amount of $1,350.00.

110.    Defendant received Transfers totaling $17,550.00.

111.    At the time the Transfers were made, all funds in the Debtor's bank account arose from the collection of receivables that were generated prior to the execution of the Agreement.

112.    Under the Agreement, Defendant had no rights to repayment from any of the Debtor's receivables other than Post-Agreement Receivables.

25

113.    Debtor had creditors at the time of the Transfers and incurred additional debt thereafter. For example, Kramon and Graham, P.A. filed its claim in the amount of $20,513.88 for the services rendered to the Debtor from August, 2020 through November, 2021.

114.    The Transfers made without fair consideration.

115.    At the time of the Transfers, the present fair market value of the Debtor's assets was less than the amount required to pay its probable liability on its existing debts as they became absolute and matured.

116.    The Debtor was insolvent at the time that such Transfers were made.

WHEREFORE, Plaintiff prays for the entry of an Order of this Court:

a.    Avoiding the Transfers made to Defendant under 11 U.S.C. § 544;

b.    Directing Defendant to pay Plaintiff an amount equal to (i) the Transfers, (ii) interest from the date of the  filing of this Complaint, and (iii) the costs of this action; and

c.    For such other and further relief as is just and proper.

## COUNT VI – AVOIDANCE OF PREFERENTIAL TRANSFERS  (11 U.S.C. § 547(b))

117.    Plaintiff incorporates paragraph 1 through 85 as if more fully set forth herein.

118.    During the ninety (90) day period preceding the filing of the Petition, the Debtor transferred property to or for the benefit of Defendant in the aggregate amount of not less than $17,550.00 (individually, a "90-Day Transfer," and one or more, the "90-Day Transfers").

119.    The 90-Day Transfers were a transfer of an interest of the Debtor in property.

120.    The 90-Day Transfers were made to or for the benefit of the Defendant.

121.    The 90-Day Transfers were made for or on account of antecedent debts ("Debt") owed by the Debtor before such 90-Day Transfers were made.

122.    The 90- Day Transfers were made while the Debtor was insolvent.

123.     The 90-Day Transfers were made on or within 90 days before the date of the filing of the Petition.

124.     The 90-Day Transfers enabled Defendant to receive more than it would have received in this chapter 7 case had the 90-Day Transfers not been made and had Defendant received payment on the Debt to the extent provided by the Bankruptcy Code.

125.     The 90-Day Transfers constitute voidable preferences pursuant to § 547 of the Bankruptcy Code.

126.     Plaintiff, based on reasonable due diligence in the circumstances of this case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c), has brought this action under Section 547. Plaintiff notified Defendant of his intention to bring this action and requested Defendant to provide any defenses it may assert. Plaintiff has not received a legally sufficient response to this request.

WHEREFORE, Plaintiff prays the entry of an order of this Court:

a.       Avoiding the 90-Day Transfers made to Defendant under 11 U.S.C. § 547;

b.       Directing Defendant to pay Plaintiff an amount equal to (i) the 90-Day Transfers, (ii) interest from the date of the filing of the Complaint, and (iii) the costs of this action;

c.       Disallowing the claim(s), if any, of Defendant; and

d.       For such other and further relief as is just and proper.

## COUNT VII – TURNOVER OF PROPERTY OF ESTATE (11 U.S.C. § 542)

127.     The Debtor incorporates paragraphs 1 through 126 as if more fully set forth herein.

128.     PNC and the Sureties have perfected first and second liens on all assets of the Debtor, as well as the subrogation rights of the Sureties.

129. On December 30, 2022, this Court entered an Order[4] that authorized the assignment of the rights of PNC and the Sureties to Plaintiff, as follows:

a. Surety hereby grants, conveys, and assigns to the Trustee any and all right, title, and interest it may have against any of the Merchant Advance Lenders and in and to the Claims. The Trustee in Trustee's name or otherwise, but for the sole use and benefit of the captioned Chapter 7 Estate, may demand, sue for, compromise, collect, and give satisfaction for any such Claims. Such assignment includes, without limitation, the Surety's lien rights in and against the Receivables and the Claims (collectively, the "Surety Assignment").

b. PNC hereby grants, conveys, and assigns to the Trustee any and all right, title, and interest it may have against any of the Merchant Advance Lenders and in and to the Claims. The Trustee in Trustee's name or otherwise. but for the sole use and benefit of the captioned Chapter 7 Estate, may demand, sue for, compromise, collect, and give satisfaction for any such Claims. Such assignment includes, without limitation, PNC's lien rights in and against the Receivables and the Claims (collectively, the "PNC Assignment").

130. Defendant received Transfers totaling $17,550.00.

131. At the time the Transfers were made, all funds in the Debtor's bank account arose from the collection of Debtor's receivables that were generated prior to the execution of the Agreement and were subject to the perfected liens of PNC and the Sureties.

132. The rights of PNC and the Sureties to the Transfers are property of the Estate.

133. The Transfers were made from proceeds of receivables that secured the obligations of the Debtor to PNC and the Sureties, whose lien rights were superior to Defendant's claims. As assignee to PNC and the Sureties, Plaintiff holds a first lien on the property of the Estate.

134. Defendant's receipt of the Transfers was in derogation of the lien rights of PNC and the Sureties and the subrogation rights of the Sureties.

135. Defendant is in possession, custody and control of the Transfers that are property of the Estate which the Estate may use, sell, or lease under 11 U.S.C. § 363.

---

[4]   See docket no. 135, Consent Order Authorizing Motion for Authority to Compromise Controversy.

136.     The Estate, as assignee to the rights of PNC and the Sureties, is entitled to recover the Transfers from Defendant.

WHEREFORE, Plaintiff prays for the entry of an Order of this Court:

a.      Directing Defendant to turn over the sum of $17,550.00; and

b.      For such other and further relief as is just and proper.

### COUNT VIII – DISALLOWANCE
### OF CLAIM (11 U.S.C. § 502(d))

137.     Plaintiff incorporates paragraphs 1 through 136 as if more fully set forth herein.

138.     To the extent Defendant holds or will file an otherwise valid and enforceable claim, Plaintiff objects to the payment of said claim unless and until any and all avoidable transfers are returned to Plaintiff.

WHEREFORE, Plaintiff prays for the entry of an order of this Court:

a.      Entering judgment in favor of Plaintiff and against Defendant avoiding the Transfers;

b.      Entering judgment in favor of Plaintiff and directing that Defendant pay Plaintiff an amount equal to (i) the Transfers, (ii) interest from the date of the filing of this Complaint, and (iii) the costs of this action;

c.      Disallowing the claim(s), if any, of Defendant; and

d.      For such other and further relief as is just and proper.

### COUNT IX  – RECOVERY OF TRANSFERS (11 U.S.C. § 550)

139.     Plaintiff incorporates paragraph 1 through 136 as if more fully set forth herein.

140.     The Defendant was the initial transferee of such Transfers and 90-Day Transfers from the Debtor.

141.     The Defendant is the entity for whose benefit the Transfers and 90-Day Transfers were made.

142.     The Transfers and 90-Day Transfers are recoverable from the Defendant pursuant to § 550 of the Bankruptcy Code.

WHEREFORE, Plaintiff prays the entry of an Order of this Court:

a.      Entering judgment in favor of Plaintiff and against Defendant avoiding the Transfers;

b.      Entering judgment in favor of Plaintiff in the amount equal to (i) the Transfers, (ii) interest from the date of the filing of this Complaint, and (iii) the costs of this action; and

c.      For such other and further relief as is just and proper.

/s/ Marc E. Shach
Marc E. Shach, Federal Bar #06788
mes@cooncolelaw.com
Gary R. Greenblatt, Federal Bar #02870
grg@cooncolelaw.com
Coon & Cole, LLC
305 W. Chesapeake Avenue, Suite 510
Towson, MD 21204
410-244-8800 – Phone
410-825-5941 – Fax

Attorneys for the Plaintiff